## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SOELECT, INC.,
            Plaintiff

    v.

HYUNDAI AMERICA TECHNICAL
CENTER, INC.,
            Defendant

No. 22 CV 1342

Judge Jeremy C. Daniel

### MEMORANDUM OPINION AND ORDER

Soelect, Inc. ("Soelect"), a startup focused on developing alloys for lithium batteries, alleges that Hyundai American Technical Center, Inc. ("HATCI") breached a materials transfer agreement by capturing unauthorized images of Soelect's proprietary "Lithium-X" technology. (R. 1.)[1] Soelect seeks $10 million in damages plus interest pursuant to the contract's liquidated damages provision. (*Id.* ¶ 23.) The parties each have moved for summary judgment on Soelect's breach of contract claim and the enforceability of the liquidated damages clause. (R. 106; R. 119.) Soelect also asks this Court to strike declarations submitted in support of HATCI's motion for summary judgment. (R. 149.) For the reasons that follow, Soelect's motion to strike is granted in part and denied in part, Soelect's motion for summary judgment is

---

[1] For ECF filings, the Court cites to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate. For documents filed under seal, the Court cites the sealed version of the documents while attempting not to reveal any information that could be reasonably deemed confidential. Confidential information is discussed to the extent necessary to explain the path of the Court's reasoning. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000).

granted in part and denied in part, and HATCI's motion for summary judgment is denied in its entirety.

## BACKGROUND[2]

The Court takes the following from the parties' Local Rule 56.1 submissions,[3] the materials cited therein, and all other aspects of the record in this case. Facts are genuinely undisputed unless otherwise noted.

Soelect is a North Carolina-based startup that researches and develops lithium battery components used in a variety of electronics, including automobiles. (R. 1 ¶ 6.) The company was founded in 2018 by Dr. Sungjin Cho, a Korean immigrant and former professor at North Carolina A&T State University. (Def.'s Resp. to Pl.'s SOF ¶¶ 1--2.) One of Soelect's proprietary technologies is "Lithium-X," a material used to craft metal anodes used in rechargeable batteries. (R. 125-1 at 100:11–19.) Soelect represents that Lithium-X increases batteries' efficiency by reducing the formation of "dendrites," or metallic microstructures that form during the charging process. (Pl.'s SOF ¶¶ 8, 14–15; R. 109-9 at 7.)

---

[2] This Court has diversity jurisdiction under 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000.00. Soelect is a Delaware corporation with its principal place of business in North Carolina. (R. 1 ¶ 2.) HATCI is a Michigan corporation with its principal place of business in Michigan. (*Id.* ¶ 3.)

[3] Soelect's Statement of Undisputed Material Facts ("Pl.'s SOF") (R. 109-2); HATCI's Statement of Undisputed Material Facts ("Def.'s SOF") (R. 122); HATCI's Local Rule 56.1(b)(2) Responses to Soelect's Statement of Material Facts ("Def.'s Resp. to Pl.'s SOF" (R. 125 at 1–43); HATCI's Statement of Additional Material Facts ("Def.'s SOAF") (R. 125 at 43–48); Soelect's Response to HATCI's Statement of Additional Material Facts ("Pl.'s Resp. to Def.'s SOAF") (R. 139-2); Soelect's Local Rule 56.1(b)(2) Responses to HATCI's Statement of Undisputed Material Facts ("Pl.'s Resp. to Def.'s SOF") (R. 138.)

Defendant HATCI is an American subsidiary of Hyundai Motor Company ("HMC"), a Korean automobile manufacturer. (Def.'s SOF ¶ 1.) Through its "CRADLE" program,[4] HATCI identifies and invests in North American startups that are "strategically aligned" with its parent company. (*Id.* ¶ 15; *see also* Pl.'s SOF ¶¶ 10–11.) HATCI has identified "metallic lithium anodes" as an innovation sector that is ripe for investment. (Def.'s Resp. to Pl.'s SOF ¶ 12.)

The growth potential for lithium batteries led HATCI to Lithium-X. (Pl.'s SOF ¶ 12.) In 2018, HATCI employee Dr. Seungwan Kim approached Soelect to discuss potential investment opportunities. (*Id.* ¶ 19; Def.'s Resp. to Pl.'s SOF ¶ 16.) In February 2019, the parties signed a nondisclosure agreement and began to discuss terms pursuant to which Soelect would transfer samples of Lithium-X to HATCI for research purposes to determine whether HATCI would invest in Soelect. (Def.'s Resp. to Pl.'s SOF ¶¶ 19–20.) The parties exchanged at least six drafts of the agreement, which was reviewed by at least five HATCI employees and eventually memorialized as a "Materials Transfer Agreement" ("MTA"). (*Id.* ¶ 41.)

The MTA requires HATCI to pay Soelect $60,000.00 in exchange for the right to receive and test samples of Lithium-X. (Pl.'s SOF ¶ 43.) Specifically, the MTA applies to the transfer of "Proprietary Materials used . . . or otherwise disclosed to HATCI during the course of the term of this Agreement." (R. 108-23 ("MTA").) "Proprietary Materials" is defined to include materials listed in Exhibit A of the MTA, as well as "any unmodified derivatives, portions and derivatives thereof provided

---

[4] "CRADLE" is short for "Center for Robotic-Augmented Design in Living Experiences." *See* https://www.cradleinc.com/.

3

concurrently or subsequently by [Soelect]." (*Id.*) The agreement provides that "[a]ny and all testing or examination of the Proprietary Materials shall be conducted in accordance with the timeline and technical details set forth [in] Exhibit A or otherwise agreed in advance in a written conformation included (*sic*) email based upon copy of recipient." (*Id.* § 3.) Exhibit A provides a three-month timeline (September 2019 to November 2019) for testing to be conducted by Dr. WonKeun and the Uiwang Future Energy Research Team at HMC's laboratories in Korea. (*Id.* at 5.) Notwithstanding the three-month timeline, the MTA provides that its terms will remain in force and effect three years from the execution date of September 1, 2019. (*Id.* § 11.)[5]

The MTA places restrictions on HATCI's use of Proprietary Materials. It forbids certain testing methods that would allow HATCI to determine the chemical composition of the samples and potentially reverse-engineer Lithium-X. (Pl.'s SOF ¶¶ 44–45.) Section 2 of the MTA provides:

> Recipient will use the Proprietary Materials only for the Purposes specifically set forth in this MTA. Recipient agrees not to perform any characterization testing including, but not limit[ed] to, x-ray powder diffraction, scanning electron microscopy, electron dispersive spectroscopy and elemental analysis. Recipient also agrees not to conduct any reverse-engineering process of SOELECT Proprietary Materials. . . .

(MTA § 2.) The MTA also restricts information sharing. Section 8 of the MTA obligates the parties to "furnish Information to persons within their organizations

---

[5] The MTA's confidentiality obligations, set forth in § 8, remain in force and effect for an additional period of five years following expiration of the initial agreement. (*See* MTA § 11.)

only as necessary to" evaluate the properties of the Proprietary Materials and determine interest, if any, in their use, development and/or commercialization, "and all persons to whom such Information will have been furnished will have been made aware of the confidential nature of such Information." (*Id.* § 8.)

Finally, the MTA provides a sum of damages to be paid to Soelect if restrictions are violated. Section 4 of the MTA (the "Liquidated Damages Provision") provides that: "[i]n the event Recipient violated the limitations set forth in Sections 2 through 4, Recipient agrees that significant material legal and financial damages [] will result from such actions, and in no event shall such Damages amount to less than Ten Million Dollars U.S. currency ($10,000,000.00)." (MTA § 4.)

The parties agree that the Liquidated Damages Provision appeared in each draft of the MTA and was lowered from $50 million to $10 million during negotiations. (Def.'s Resp. to Pl.'s SOF ¶ 26.) However, they dispute whether the amount accurately reflects the estimated damages that would probably be sustained by the unauthorized testing and use of Lithium-X. (Def.'s Resp. to Pl.'s SOF ¶¶ 41, 54; Pl.'s Resp. to Def.'s SOAF ¶¶ 9–12.) Dr. Cho stated that he arrived at the $10 million figure by valuing comparable early-stage startup companies. (R. 109-3 at 178:6–179:19, 188:6–189:10; R. 109-4 at 86:15–87:16.) HATCI contends that the figure is an aspirational valuation that Soelect was "targeting." (R. 125-10 at 177:24–178, 180:23–181:11.) The parties also dispute what portion of the company's total valuation was attributable to Lithium-X as opposed to other projects. (Pl.'s Resp. to Def.'s SOAF ¶¶ 13–14.)

The MTA was executed on September 1, 2019. (*Id.* ¶ 57.) Approximately one month later, Soelect sent samples of its "Gen 1" Lithium-X alloy to HMC laboratories in Korea for testing. (R. 108-27.) By January 2020, Soelect had sent all samples contemplated by the initial project outline set forth in Exhibit A of the MTA. (*See generally* R. 108-28; Def.'s Resp. to Pl.'s SOF ¶ 57.)

Less than two months later, the parties confirmed via email that Soelect would send "additional samples" to HMC for testing. (*See* R. 109-11 at 13–14.) These samples, which Dr. Cho referred to as an "advanced version," "continuation," and "refinement" of the prior Lithium-X samples, were termed "Gen 2" (in contrast to the previous "Gen 1" samples). (R. 108-31; R. 139-11 at 76:9–20; Pl.'s Resp. to Def.'s SOF ¶ 11.)

Soelect sent the Gen 2 samples later that summer and HMC scientists proceeded with testing them. On October 27, 2020, HMC scientists sent Soelect an email that included images of testing results. (R. 109-11.) The results included black and white images that had been produced by scanning electron microscopy ("SEM"), a process by which a specialized electron microscope is used to capture images at much higher magnifications than a traditional optical microscope. (*Id.* at 4; Pl.'s SOF ¶¶ 37, 62–63.) Notably, SEM testing was expressly forbidden by § 2 of the MTA. (MTA § 2.) HATCI's expert, Dr. Von Sacken, conceded that the images had been obtained by SEM testing and that the images showed the "cycled surface" of the Lithium-X material. (*See* Pl.'s SOF ¶¶ 62–63.)

6

Soelect took the position that HATCI had breached the MTA by performing prohibited testing on the Gen 2 samples. (Pl.'s SOF ¶ 67.) The parties failed to resolve their dispute, and this litigation followed. (Def.'s Resp. to Pl.'s SOF ¶ 74.) Soelect filed a complaint alleging breach of the MTA and seeking $10 million damages plus interest pursuant to the Liquidated Damages Provision. (R. 1.) The parties now move for summary judgment on Soelect's breach of contract claim and the enforceability of the Liquidated Damages Provision. (R. 106; R. 119.) Soelect also moves to strike the testimony of two of HATCI's expert witnesses. (R. 149.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that the Court shall grant summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A 'material fact' is one identified by the substantive law as affecting the outcome of the suit." *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine dispute exists as to any material fact if a reasonable jury could return a verdict for the nonmoving party. *Id.* In evaluating cross-motions for summary judgment, the Court construes the facts and draws inferences in favor of the party against whom the motion under consideration

is made. *First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009).

## ANALYSIS

### I. SOELECT'S MOTION TO STRIKE

The Court begins by addressing Soelect's motion to strike declarations submitted by HMC scientists Jongchan Song and Samuel Seo in support of HATCI's motion for summary judgment. (R. 149.) Soelect argues that Song and Seo's testimony should not be considered because HATCI did not make them available for deposition prior to filing its motion for summary judgment. (*Id.* at 6.) Alternatively, it argues that declarations introduced in support of HATCI's summary judgment reply improperly introduce new facts in violation of Local Rule 56.1. (*Id.* at 3–5.) Finally, Soelect argues that portions of Song's testimony constitute improper expert opinions. (*Id.* at 5–6.) The Court considers each argument in turn.

### A. Opportunity to Depose Song and Seo

Soelect first objects to HATCI's use of Song and Seo's declarations on the grounds that it has been unable to depose them. (R. 149 at 6.) Song and Seo are HMC employees based in Korea. Although HATCI represents that it lacks control over these witnesses, it indicated that HMC has "voluntarily agreed" to make them available for deposition. (R. 97 ¶ 4.) But while the discovery deadline in this case has been extended twice—in part to give Soelect the opportunity to depose these two witnesses—to date, HATCI has not made Song and Seo available for deposition.

The Court "has broad discretion concerning the imposition of discovery sanctions." *Park v. City of Chi.*, 297 F.3d 606, 614 (7th Cir. 2002). The apparent

inconsistency between HATCI's representation that it lacks control over Song and Seo and its introduction of their testimony at summary judgment is troubling. Nonetheless, Soelect's inability to depose Song and Seo does not automatically render their testimony inadmissible.

While "[c]ourts in the Seventh Circuit routinely bar witnesses from testifying at trial where the witnesses have not been produced in accordance with a court's discovery deadlines," *Anglin v. Sears, Roebuck & Co.*, 139 F. Supp. 2d 914, 917 (N.D. Ill.), *modified*, 179 F. Supp. 2d 836 (N.D. Ill. 2001), Soelect has not identified any order compelling the depositions of Song and Seo by a date certain. The Court's June 27, 2023, scheduling order mandated that discovery be completed no later than July 21, 2023. (R. 94.) But the parties stipulated in advance of that deadline that any depositions of Song and Seo would occur after the deadline had passed. (R. 97 ¶ 4.) The agreement does not specify a date by which Song and Seo's depositions must be completed. (*See id.*) And Soelect never moved to compel their depositions by a date certain.

Under these circumstances, the Court concludes that HATCI may rely on declarations submitted by Song and Seo in support of its motion for summary judgment. Accordingly, Soelect's motion to strike their affidavits based on its inability to depose them is denied.

9

## B.    Local Rule 56.1(f)

Next, Soelect moves to strike affidavits submitted by Song and Seo in support of HATCI's summary judgment reply. Soelect argues that the reply declarations introduce facts that were not included in HATCI's initial Local Rule 56.1 submissions.

Northern District of Illinois Local Rule 56.1(f) provides that "[n]o reply to a LR 56.1(b)(2) or LR 56.1(c)(2) response is permitted without the court's permission." HATCI did not seek leave to adduce additional facts in support of its reply. As a general matter, "[p]arties moving for summary judgment are [] forbidden from raising new arguments and asserting additional facts on reply." *Maher v. Rowen Grp., Inc.*, No. 12 C 7169, 2015 WL 273315, at *8 (N.D. Ill. Jan. 20, 2015) (collecting cases). As with discovery sanctions, the Court enjoys broad discretion in ensuring compliance with its Local Rules. *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015).

There is an exception to the rule that a party may not introduce additional facts or evidence in a reply in circumstances where the replying party is responding to matters placed at issue by the nonmoving party's opposition brief. *Maher*, 2015 WL 273315, at *8. If "the reply affidavit merely responds to matters placed in issue by the opposition brief and does not spring upon the opposing party new reasons for the entry of summary judgment, reply papers—both briefs and affidavits—may properly address those issues." *Id.* (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 n.1 (7th Cir. 1996)).

Song and Seo's reply declarations are consistent with the exception identified in *Beck*. The declarations are offered to rebut statements made in a declaration submitted by Dr. Cho to oppose HATCI's motion for summary judgment. (*See* R. 144-

2 ¶ 2; 144-3.) They are not accompanied by an additional statement of material facts. *Compare Premier Cap. Mgmt., LLC v. Cohen*, 02 C 5368, 2008 WL 4378313, at *2 n.4 (N.D. Ill. Mar. 24, 2008). Because the declarations pertain to statements introduced by Soelect in opposition to HATCI's motion for summary judgment, there is no potential for unfair surprise. The Court therefore denies Soelect's motion to exclude Song and Seo's reply declarations under Local Rule 56.1(f).

## C.     Federal Rule of Civil Procedure 37(c)(1)

Finally, Soelect objects to Song's declaration on the grounds that he was never disclosed as an expert witness. Federal Rule of Civil Procedure 26(a) requires the parties to timely disclose any expert witnesses whom they intend to present at trial. *Karum Holdings LLC v. Lowe's Cos., Inc.*, 895 F.3d 944, 951 (7th Cir. 2018) (citing Fed. R. Civ. P. 26(a)(2)(A), (C)). Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." A district court has "broad discretion" in evaluating the justification for, and harm resulting from, the failure to comply with Rule 26(a). *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

HATCI does not dispute that it failed to disclose Dr. Song as an expert witness before the expert discovery cutoff date of July 21, 2023. (R. 94.) Instead, it argues that Song's declaration consists of permissible lay or fact witness testimony. Unlike expert witnesses, fact witnesses are not subject to the disclosure requirements of Rule 26(a)(2). *See* Fed. R. Civ. P. 26(a)(1)(A). But "[the] duty to disclose a witness *as an*

*expert* is *not* excused when a witness who will testify as a fact witness and as an expert witness is disclosed as a fact witness." *Tribble v. Evangelides*, 670 F.3d 753, 759 (7th Cir. 2012) (emphasis in original).

To constitute lay testimony under Rule 701, a witness's testimony must be (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue, and—at issue here—(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Fed. R. Evid. 701. The final requirement is designed "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." *Chi. Joe's Tea Room, LLC v. Vill. of Broadview*, 94 F.4th 588, 597 (7th Cir. 2024).

Reviewing Song's declaration, the Court finds that much of the declaration consists of permissible lay witness testimony. Song was a member of the HMC team that performed testing on the Gen-2 samples. (R. 144-2 ¶ 2.) He is therefore able to testify, based on his personal knowledge, about what kind of testing was performed on the samples and whether he used information obtained from the testing in any subsequent research or publications. Such testimony is helpful to the factfinder, as it is relevant to whether the testing performed by HMC scientists violated the MTA's testing restrictions.

However, Song also offers opinions that are premised on scientific, technical, or specialized knowledge. For example, Song opines on the relationship between the

operation hours of symmetric cells to the life of full cells, (*id.* ¶ 14), the standard definition of "life of full cells" in the lithium battery industry, (*id.* ¶ 15), and whether Lithium-X batteries "demonstrated superior performance." (*Id.* ¶ 16.) These portions of Song's testimony consist of undisclosed expert testimony within the scope of Rule 702. Because Song was not disclosed as an expert, he may not testify as to these topics "unless non-disclosure was justified or harmless." *Tribble*, 670 F.3d at 720.

Since HATCI does not argue that its failure to disclose Song was justified, it may not rely on his testimony unless the failure was harmless. Factors that a district court must consider in determining whether non-compliance with Rule 26(a) is harmless are (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence. *Id.*

HATCI never disclosed to Soelect that it intended to rely on Song's expert testimony in its stipulation extending the discovery deadlines. HATCI also represented that it lacks control over Song as an HMC employee but introduced his testimony in support of its motion for summary judgment. Under these circumstances, the Court finds that HATCI's reliance on Song's expert testimony would be unfairly prejudicial. The Court therefore grants Soelect's motion to strike paragraphs 14, 15, and 16 of Song's declaration.

## II.    THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

Having addressed Soelect's motion to strike, the Court next considers the parties' cross-motions for summary judgment. Soelect asserts a single claim for

breach of contract under the MTA, which contains a North Carolina choice-of-law provision. (*See* MTA § 12). Choice of law provisions are enforced if they are reasonable. *Yassan v. J.P. Morgan Chase & Co.*, 708 F.3d 963, 973 (7th Cir. 2013). Because North Carolina is Soelect's state of incorporation, and because neither party objects to the application of North Carolina law, the Court applies North Carolina law to Soelect's breach of contract claim. *Id.*

Under North Carolina law, "to prevail on a claim for breach of contract, a party must show: "'(1) existence of a valid contract; and (2) breach of the terms of that contract.'" *Poor v. Hill*, 530 S.E.2d 838, 843 (N.C. App. Ct. 2000) (citation omitted). Only the second element is at issue.

Soelect argues that HATCI breached § 2 of the MTA by performing SEM testing on its Gen 2 Lithium-X samples. (Pl.'s SOF ¶¶ 62–63.) It presents evidence of the images taken of the Gen 2 samples, along with HATCI's admission that such images were created using SEM testing. (Def.'s Resp. to Pl.'s SOF ¶ 63.)

Although HATCI concedes that SEM testing occurred, it maintains that it did not breach the MTA. It offers four arguments to support this position. First, it argues that the Gen 2 samples do not constitute "Proprietary Materials" under the MTA. (R. 121 at 13–16.) Second, HATCI argues that, even if the Gen 2 samples are "Proprietary Materials," the tests at issue are not governed by the MTA because they occurred outside of the three-month project timeline specified by Exhibit A. (*Id.*) Third, HATCI argues that it is not responsible for any SEM testing performed by HMC employees since HMC is not a party to the agreement. (*Id.* at 16–18.) Finally,

HATCI argues that the SEM testing performed is not prohibited by the MTA because it is not "characterization" testing. (*Id.* at 18.) The Court considers each argument in turn.

### A. Whether the Gen 2 Samples are "Proprietary Materials" Under the MTA

HATCI first argues that the Gen 2 samples fall outside of the MTA's definition of "Proprietary Materials." This argument comes in two flavors. First, HATCI asserts that the term "Proprietary Materials" refers exclusively to the twelve alloy samples listed on Exhibit A of the executed MTA. (R. 121 at 13–16.) Second, HATCI argues that the Gen 2 samples are not "derivatives" of the Gen 1 samples. (*Id.*)

The first version of the argument—that "Proprietary Materials" refers exclusively to the alloys specified on Exhibit A—does not square with the plain language of the MTA. *Five Oaks Homeowners Ass'n, Inc. v. Efirds Pest Control Co.*, 331 S.E.2d 296, 298 (N.C. 1985) ("When the language of a written contract is plain and unambiguous, the contract must be interpreted as written and the parties are bound by its terms"); *Martin v. Martin*, 216 S.E.2d 456, 457–58 (N.C. App. Ct. 1975) (holding that a court "must construe [a] contract as written").

Notably, the MTA applies to Proprietary Materials "used . . . or *otherwise disclosed to HATCI during the course of the term of this Agreement*." (MTA at Rec. 1 (emphasis added).) The recital goes on to indicate that "'Proprietary Materials' shall be deemed to include . . . any unmodified derivatives, portions and derivatives [of the samples] provided concurrently *or subsequently* by Soelect." (*Id.* (emphasis added).) Finally, § 1 obligates Soelect to provide "the mutually agreed upon Proprietary

15

Materials, *includ[ing]* the Li-S Alloy on Cu foil (small and large samples)" included in Exhibit A. (MTA § 1 (emphasis added).)

Under North Carolina law, "[c]ontract terms must be construed to give meaning and effect to every part of the contract, rather than leave a portion of the contract meaningless or reduced to mere surplusage." *Foodbuy, LLC v. Gregory Packaging, Inc.*, 987 F.3d 102, 113 (4th Cir. 2021) (citation omitted). If "Proprietary Materials" were limited to only the materials included on Exhibit A, then § 1's use of the term "including" as well as the recitals' references to "subsequently provided" materials and materials "otherwise disclosed" would be superfluous. The Court concludes that "Proprietary Materials" are not limited to the materials specified in Exhibit A of the MTA.

This does not necessarily mean that the Gen 2 samples are Proprietary Materials, however. The parties agree that this turns on whether the Gen 2 samples are "derivatives" of the Gen 1 samples. (Pl.'s SOF ¶ 44 (citing MTA Rec. 1).) The MTA does not define this term. Under North Carolina law, undefined terms in a contract should be given their plain, ordinary meaning. *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.*, 692 S.E.2d 605, 612 (N.C. 2010). In establishing ordinary meaning courts may consult standard legal and nonlegal dictionaries. *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 380 (4th Cir. 2017).

Merriam-Webster defines a chemical "derivative" as "a chemical substance related structurally to another substance and theoretically derivable from it" or "a substance that can be made from another substance." *Derivative*, MERRIAM-WEBSTER,

16

(Mar. 23, 2022), https://www.merriam-webster.com/dictionary/derivative. Black's Law Dictionary defines "derivative" as "[s]omething that has developed from or been produced from something else." *Derivative*, BLACK'S LAW DICTIONARY (11th ed. 2019). Thus, the Gen 2 samples are "derivative" of the Gen 1 samples if they can be made, derived, developed, or produced from the Gen 1 samples.

To support its position that the Gen 2 sample is a derivative of the Gen 1 sample, Soelect presents a declaration submitted by Dr. Cho, who has been disclosed as an expert and who has personal knowledge of the composition of Lithium-X. Dr. Cho explains that the Gen 1 and Gen 2 samples are composed of the same chemicals and that the Gen 2 sample was derived from the Gen 1 sample. (R. 138-5 ¶ 8.) In response, HATCI cites messages from Dr. Cho indicating that the Gen 2 sample, unlike the Gen 1 sample, is a "Lithium-X composite" material rather than an alloy. (R. 125-9 at 38–39.) However, in his opposition declaration, Dr. Cho stated that the Gen 2 sample was, in fact, derived from the Gen 1 sample, and that the term "composite" refers to the altered ratio of chemicals in the Gen 2 samples. (R. 138-5 ¶ 8.)

The Court concludes that there is no genuine dispute of fact that the Gen 2 sample is "derivative" of the Gen 1 sample. Cho's testimony that the Gen 2 samples were derived from the Gen 1 samples is unrebutted, as HATCI has proffered no

evidence to contradict his testimony or indicate that a lithium composite material cannot be derived from an alloy.

HATCI attempts to rebut Cho's testimony through Samuel Seo's reply declaration. (*See* R. 144-3.) Seo has not been disclosed as an expert, however, and may not opine as to whether a lithium composite is theoretically derivable from a lithium alloy (a topic that requires technical or specialized knowledge). Fed. R. Evid. 701(c), 702. Even if he could offer an opinion on the issue, he admits that he lacks personal knowledge of the chemical composition of the Gen 2 samples. (*Id.* ¶ 11.) Instead, Seo quotes text messages that he received from Cho indicating that the Gen 2 samples were "not an alloy" and were "something new." (*Id.* ¶¶ 8–10.) These statements can be true if the Gen 2 samples were made, derived, developed, or produced from the Gen 1 samples. Absent evidence showing that the Gen 2 composite material could not be derived from the Gen 1 alloy, these statements are insufficient to create a genuine issue of material fact as to whether the Gen 2 samples are "derivative" of the Gen 1 samples.

HATCI also faults Dr. Cho's declaration as conclusory, citing *Stein v. Ashcroft*, in which the Seventh Circuit held that "[b]ald and self-serving assertions in affidavits, unsubstantiated by any documentation or other testimony" are insufficient to create a genuine issue of fact on summary judgment. 284 F.3d 721, 726 (7th Cir. 2002). In *Stein*, however, the affiant was a lay witness who did not provide any factual information to substantiate the legal conclusions in her affidavit. *Id.* Here, by contrast, Dr. Cho has been disclosed as an expert, and may opine as to matters within

18

in his field. (R. 149-3); Fed. R. Evid. 702, 704. As the founder of Soelect, Dr. Cho has personal knowledge of Lithium-X's chemical composition. Dr. Cho explained that both Gen 1 and Gen 2 of the Lithium-X anode contain a mix of alloy and composite materials, and that both contained the same materials, albeit in different ratios. (R. 138-5 ¶ 8.)

There is no genuine dispute of material fact that the Gen 2 samples constitute "Proprietary Materials" under the MTA. The Court therefore grants Soelect's motion for summary judgment in part on this issue and denies HATCI's motion for summary judgment.

## B. Whether the MTA's Term Covered Testing of the Gen 2 Samples

HATCI next argues that testing that occurred in 2020 falls outside the scope of the MTA because it was not performed in accordance with the three-month project timeline set forth in Exhibit A. Section 3 of the MTA provides that "[a]ny and all testing or examination of the Proprietary Materials shall be conducted in accordance with the timeline and technical details set forth in Exhibit A, or otherwise agreed in advance in a written confirmation email based upon copy of recipient." (MTA § 3.)

The problem with this argument is that the MTA expressly states that its provisions remain in force and effect for a period of three years following the execution date. (MTA § 11.) In interpreting a contract, the Court must review "the entire agreement" with the goal of "harmoniz[ing] all clauses." *State v. Philip Morris USA Inc.*, S.E.2d 85, 91 (N.C. 2009). Reading the contract as a whole, the Court finds that

Exhibit A refers to a single project covered by the MTA, the completion of which does not discharge the parties' obligations.

The MTA also allows for the extension of the initial project timeline if the extension is "agreed in advance in a written confirmation email based upon copy of recipient." (MTA § 3.) In a series of emails exchanged in early 2020, HATCI agreed to receive the Gen 2 materials and perform testing on them. (R. 108-30.) In an email sent on January 24, 2020, HATCI employee Seungwan Kim acknowledges Soelect's offer of new samples and asks HMC scientist Samuel Seo if he can test them. (*Id.* at 6.) Seo responds three days later, stating "[t]hanks for offering the additional samples. We are able to run the tests with the new samples as soon as we receive them." (*Id.* at 5.) The remainder of the email thread consists of updates on the delivery schedule. (*See id.*) Viewing the facts in the light most favorable to HATCI, the Court concludes that the parties' communication constituted an "advance . . . written confirmation email" that extended the project timeline with respect to the Gen 2 samples. (MTA § 3.)

To rebut this conclusion, HATCI points to an internal email sent by Dr. Cho in December 2020 in which Cho stated that the parties had completed performance of the MTA in December 2019, eight months before the Gen 2 samples were provided. (R. 125-10 at 49 ("The MTA is already completed end of last year [2019]. Please see the attached. We received all payments from Hyundai.").) Essentially, HATCI argues

that Cho's statement constituted an acknowledgment that both parties had completely discharged their duties and the contract had expired.

HATCI's arguments are not supported by North Carolina law. First, Cho's internal email is not a modification or waiver of Soelect's rights under the MTA, because it did not comply with the MTA's merger clause. (*See* MTA § 10 ("No modification, amendment or waiver may be accomplished to the terms of this MTA without the written consent of both parties."); *see also Huttenstine v. Mast*, 537 F. Supp. 2d 795, 803 (E.D.N.C. 2008), *aff'd*, 334 F. App'x 536 (4th Cir. 2009) (rejecting the defendant's argument that email communications superseded or modified the parties' agreement due to the agreement's merger clause).

Even if the merger clause did not disclaim waiver except by mutual consent in writing, no reasonable jury could conclude that Cho's internal email knowingly and voluntarily waived Soelect's rights under the MTA. *See Canadian Am. Ass'n of Pro. Baseball, Ltd. v. Ottawa Rapidz*, 686 F. Supp. 2d 579, 586–87 (M.D.N.C. 2010) (citing *Lewis v. Jones,* 512 S.E.2d 87, 90 (N.C. 1999)) (identifying knowledge and intent as requirements for waiver under North Carolina law).

In the first place, Soelect had already communicated its position that HATCI had breached the MTA to HATCI in November 2020, a month before the email in question was sent. (Def.'s Resp. to Pl.'s SOF ¶¶ 67–68.) Cho's December 2020 email was sent internally in response to a message from a Soelect board member stating that "Hyundai very much wants us to accept their acknowledgement of this error and waive our right to any penalty." (R. 125-10 at 50.) In the email, Cho insists that the

SEM testing was a "terrific breach" and indicates that Hyundai is "responsible for damages." (*Id.* at 49–50). He expressly indicates that he is unwilling to waive any rights absent monetary compensation or Hyundai entering into a further agreement with Soelect. (*See id.*) No reasonable jury could conclude that this email represented a knowing or intentional relinquishment of Soelect's rights under the MTA.

Because there is no genuine dispute of fact that the MTA covered testing that took place in 2020, the Court grants Soelect's motion for summary judgment on this issue and denies HATCI's motion for summary judgment.

### C. Whether HATCI is Liable for Testing Performed by HMC

HATCI next argues that it cannot be liable for breaching the MTA because the SEM images of the Gen 2 Lithium-X samples were not taken by HATCI employees, but by scientists employed by HMC. (R. 121 at 16–18.) HATCI points out that the MTA defines "Recipient" as HATCI exclusively, and that the agreement is silent as to the duties imposed upon HATCI's parent company or affiliates. (*See id.*) Because HMC is not covered by the MTA, HATCI argues that it cannot be responsible for testing performed by HMC employees.

In response, Soelect first cites § 8 of the MTA, which provides that each party "will furnish Information to persons within their organizations only as necessary to accomplish said purpose and all persons to whom such information will have been furnished will have been made aware of the confidential nature of such information." (MTA § 8.) Soelect argues that HMC is part of HATCI's "organization," and that

HATCI breached this provision by failing to inform HMC's employees of the confidential nature of the Lithium-X samples. (R. 109-1 at 11.)

Soelect's argument regarding § 8 is insufficient to establish that the MTA's testing restrictions apply to HMC or its employees. First, the MTA does not define "persons within [each party's] organization." (*See generally* MTA.) The ordinary meaning of the term "person" could refer to either individuals or business entities. *See, e.g.*, *Person*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The word 'person' is now generally used in English to denote a human being, but the word is also used in a technical legal sense, to denote a subject of legal rights and duties.") (internal citation omitted). Since the term is susceptible to more than one reasonable interpretation, it is ambiguous. *See Register v. White*, 599 S.E.2d 549, 553 (N.C. 2004). And "[w]hen an agreement is ambiguous and the intention of the parties is unclear . . . interpretation of the contract is for the jury." *Majestic Cinema Holdings, LLC v. High Point Cinema*, 662 S.E.2d 20, 22 (N.C. App. Ct. 2008) (citation omitted).

Even if HMC is a "person within [HATCI's] organization," however, this term only appears in § 8 of the MTA, which discusses the parties' confidentiality obligations, and not in § 2, which contains the agreement's testing restrictions. A violation of § 8 does not entitle Soelect to the benefit of the Liquidated Damages Clause, which is only triggered if "the limitations set forth in Section 2 through 4" of the MTA are violated. (MTA § 4.)

Nonetheless, although Soelect's argument regarding § 8 is unpersuasive, HATCI's interpretation of the agreement—that the plain language of the MTA

23

exempts HMC scientists from the agreement's testing restrictions—is equally implausible. The MTA variously refers to the "Recipient" of the agreement as the party responsible for testing the Proprietary Materials, disclosing the testing results, and ensuring the confidentiality of the transferred materials. (MTA §§ 2–6.) Exhibit A of the MTA provides that Soelect will ship samples to "Dr. WonKeun in Uiwang Future Energy Research Team, Hyundai Motors in Korea." (*Id.* at Ex. A.) The parties do not dispute that Dr. WonKeun and the Future Energy Research Team are affiliated with HMC, not HATCI. (Def.'s Resp. to Pl.'s SOF ¶ 51.) Nor does HATCI dispute that the Gen 1 materials—which both parties agree were subject to the MTA—were sent to HMC laboratories in Korea for testing. (*Id.* ¶ 57.) Thus, the MTA expressly contemplates that testing of Lithium-X samples would be performed by HMC and its employees. HATCI provides no explanation as to why the MTA would place extensive testing restrictions on HATCI exclusively if the materials in question were never going to be tested by HATCI in the first place.

It is a general rule of contract interpretation that contracts should be construed as to avoid purposeless or absurd results. *Malone v. Barnette*, 772 S.E.2d 256, 262 (N.C. App. Ct. 2015) ("Basic rules of construction applicable to contracts preclude an interpretation rendering such language in the parties' agreement purposeless."); *Jarman v. Twiddy & Co. of Duck, Inc.*, 889 S.E.2d 488, 498 (N.C. App. Ct. 2023) (quoting *Atl. Disc. Corp. v. Mangel's of N.C., Inc.*, 163 S.E.2d 295, 299 (N.C. App. Ct.

1968)) ("A construction of a contract leading to an absurd, harsh or unreasonable result should be avoided if possible.").

Accepting HMC's interpretation of the MTA would mean that the same laboratories to which the parties contemplated sending the materials would not be subject to the testing restrictions that formed the basis of their agreement. This arrangement would be contrary to the parties' understanding at the time of contracting, as evidenced by their contemporaneous communications. (*See* Pl.'s SOAF ¶ 1.) Indeed, if HATCI's interpretation of the contract was correct, then the MTA's testing restrictions would not apply to any of the testing performed by the parties and would be effectively purposeless. *Barnette*, 772 S.E.2d at 262. The Court therefore rejects HATCI's interpretation of the MTA.

With each of the parties' chief theories of interpretation of rejected, the Court must reconcile the MTA's narrow definition of "Recipient" with the fact that the contract expressly contemplates performance by HMC. Soelect identifies another way out of the interpretive thicket by appealing to the principle that a party who delegates its duties to a nonparty remains liable for the delegee's performance. (R. 109-1 at 11); *see also* Restatement (Second) of Contracts § 318 (1981) ("[N]either delegation of performance nor a contract to assume the duty made with the obligor by the person delegated discharges any duty or liability of the delegating obligor.").

Under North Carolina law, contract duties are generally delegable unless prohibited by statute, public policy, or the terms of the contract. *See Kraft Foodservice, Inc. v. Hardee*, 457 S.E.2d 596, 598 (N.C. 1995); 29 Williston on

Contracts § 74:28 (4th ed.) (citing *Parkersmith Props. v. Johnson*, 525 S.E.2d 491 (N.C. App. Ct. 2000)).[6] "[G]eneral North Carolina contract law" provides for a delegating party's "continued liability to the other party to the original contract" in the event of a delegation. *Hyatt v. Mini Storage on Green*, 763 S.E.2d 166, 172 (N.C. App. Ct. 2014); *see also Rose v. Vulcan Materials Co.,* 194 S.E.2d 521, 534 (N.C. 1973) ("[T]he assignor has power only to delegate and not to transfer the performance of duties as against the other party to the contract assigned"); *cf. Atlantic & N.C.R. Co. v. Atlantic & N.C. Co.,* 61 S.E. 185, 189 (N.C. 1908) (holding that, in the absence of a novation, the delegating party would, "notwithstanding the assignment, still remain liable" for performance). Even if a duty is nondelegable, it may be rendered delegable by the consent or ratification, or waiver of the nonassigning party. *See Reynolds and Reynolds Co. v. Tart*, 955 F. Supp. 547, 557 (W.D.N.C. 1997) (discussing ratification and consent).

The Court concludes that the contract contemplates an express delegation of HATCI's obligations to the HMC scientists who actually received and tested the materials. Notwithstanding this delegation, HATCI remained liable under the MTA for any deficiencies in performance, including the failure to comply with testing restrictions. *Hyatt*, 763 S.E.2d at 172. Moreover, even if such a delegation was not

---

[6] Though assignments of rights and delegations of duties are distinct concepts, *see* 29 Williston on Contracts § 74:27 (4th ed.), North Carolina courts appear to use the term "assignment" interchangeably to refer both to rights and duties that are transferred pursuant to an agreement. *See, e.g., Hyatt v. Mini Storage on Green*, S.E.2d 166, 171 (N.C. App. Ct. 2014) ("[A] party to a contract who completely assigns all rights *and duties* under the contract to another party remains liable to the original party with whom the assignor contracted.") (emphasis added).

expressly contemplated by the MTA, HATCI consented to or ratified the delegation by directing Soelect to ship the Lithium-X samples to HMC's Korean laboratories for testing. *Reynolds*, 955 F. Supp. at 557.

HATCI identifies no pertinent North Carolina law or evidence to rebut this conclusion. It protests that a delegation is not supported by the record. (R. 121 at 17.) But it concedes that the MTA obligated Soelect to send Lithium-X to HMC's laboratories, and that HMC's scientists accepted and tested the samples. And HATCI's 30(b)(6) deponent admitted that if HATCI needed "some technical or strategic expertise from other affiliate companies" like HMC in connection with a project, then HATCI had the ability to "request . . . their help." (R. 139-13 at 9.)

This is exactly what happened. The parties' communications confirm that Soelect coordinated with both HATCI and HMC and that the parties understood that HMC scientists would perform testing on HATCI's behalf. In emails sent to Dr. Cho in May and August of 2019, HATCI employee Seungwan Kim referred to the HMC scientists as "our engineers" and "our engineering team" and requested that Soelect send samples directly to HMC's Korean address. (R. 108-22 at 7, 9; R. 139-21.) In October 2019, Dr. Cho confirmed that Lithium-X samples would be sent to this address with both HMC and HATCI employees copied. (R. 108-27 at 5.) After the samples were sent, HATCI continued to follow up with HMC scientist Samuel Seo to

monitor the progress of the testing, (*see* R. 108-28 at 4, 7), and Seo reported information about the testing results to HATCI. (R. 108-29.)

In February 2020, Kim emailed Seo regarding testing the Gen 2 samples and Seo confirmed that HMC would be able to run additional tests. (R. 108-30 at 5–6.) (*Id.* at 5.) Finally, in November 2020, after the prohibited testing had taken place, Kim sent an internal email to a group of HMC scientists (including Seo) with a copy of the MTA attached. (*See* R. 108-37.) In the email, Kim acknowledged the prohibition on SEM testing and stated that "when we shared the results of the last evaluation, we put SEM analysis data on the last page." (*Id.* at 4.) Kim also wrote that "we may have to be more cautious when sharing the results of the evaluation" and stated that "I should have taken good care of this from the beginning." (*Id.*) There is ample evidence in the record to conclude that HATCI delegated its obligation to perform to HMC, understanding that it would remain liable for any breach of the agreement.

In reply, HATCI insists that finding a delegation would require rewriting the plain language of the contract, pointing to the agreement's merger clause. But HATCI identifies no contractual provision restricting assignment or delegation (as opposed to amendment).[7] And its "plain language" argument ignores the fact that Exhibit A of the MTA expressly contemplates Soelect sending samples to HMC and HMC

---

[7] Even if the merger clause could be construed to prohibit assignment, a merger clause need not be enforced when doing so would be inconsistent with the parties' overarching intent. *See Med. Staffing Network, Inc. v. Ridgway*, 670 S.E.2d 321, 326 (N.C. App. Ct. 2009) (holding that a court need not enforce a merger clause "when giving effect to the merger clause would frustrate the parties' true intentions" as evidenced by the "overall intended purposes of the transaction") (internal quotation omitted). Based on the communications and course of conduct described above, there is no question that the parties intended for HMC scientists to perform HATCI's testing obligations.

performing tests on HATCI's behalf. Having relied on the employees of its parent company to perform testing that it promised to do itself, HATCI cannot now disclaim responsibility for that testing's failure to comply with the MTA. The Court therefore grants summary judgment in Soelect's favor and finds that HATCI is responsible for testing performed by HMC scientists.

### D. Whether the SEM Scans Violated the MTA

Finally, HATCI argues that the SEM testing that HMC's scientists performed on the Gen 2 samples did not violate § 2 of the MTA because it did not constitute prohibited "characterization testing." (R. 121 at 14.) HATCI contends that it did not use SEM testing to determine the chemical characteristics of Soelect's Gen 2 sample, but rather to monitor lithium deposits created by HMC's own cathode during the testing process. In other words, HATCI argues that SEM testing was not performed to determine the chemical composition of the Lithium-X. Indeed, HATCI asserts that the images the scientists took did not even *allow* it to observe the chemical composition of the substance.

This argument is contrary to the plain language of the agreement. Section 2 of the MTA clearly identifies SEM as a prohibited means of testing Proprietary Materials. "When the language of a contract is clear and unambiguous, effect must be given to its terms." *Galloway ex. rel Melissa Galloway Snell Living Tr. v. Snell*, 885 S.E.2d 834, 836 (N.C. 2023) (citation omitted). Moreover, "when general terms and specific statements are included in the same contract and there is a conflict, the general terms should give way to the specifics." *Wood–Hopkins Contracting Co. v. N.C. State Ports Auth.*, 202 S.E.2d 473, 476 (N.C. 1974); *see also* Restatement

(Second) of Contracts § 203(c) ("specific terms and exact terms are given greater weight than general language").

Because the language of the MTA clearly provides that the Recipient cannot conduct SEM testing on Lithium-X samples, and because HATCI does not dispute that SEM testing was conducted on the samples in question, HATCI's argument fails. The Court concludes that the SEM testing performed by HMC is "characterization testing" under the MTA. Because there is no genuine dispute that HATCI breached the MTA by allowing SEM testing to be performed on Lithium-X samples, the Court grants Soelect's motion for summary judgment on its breach of contract claim and denies HATCI's cross motion for summary judgment.

## III. ENFORCEABILITY OF THE LIQUIDATED DAMAGES PROVISION

The parties next cross-move for summary judgment on the enforceability of the MTA's $10 million Liquidated Damages Provision. The Liquidated Damages Provision reads, in pertinent part:

> In the event Recipient violated the limitations set forth in Sections 2 through 4, Recipient agrees that significant material legal and financial damages ("Damages") will result from such actions, and in no event shall such Damages amount to less than Ten Million Dollars U.S. currency ($10,000,000.00).

(MTA § 4.) Under North Carolina law, "a sum specified in [a] contract as the measure of recovery in the event of a breach will be enforced if the court determines it to be a provision for liquidated damages, but not enforced if it is determined to be a penalty." *Majestic Cinema*, 662 S.E.2d at 23 (quoting *Brenner v. Little Red Sch. House, Ltd.*, 274 S.E.2d 206, 211 (N.C. 1981)) (internal quotation marks omitted). The North

Carolina Supreme Court has set forth the following test for determining enforceability:

> A stipulated sum is for liquidated damages only (1) where the damages which the parties reasonably anticipate are difficult to ascertain because of their indefiniteness or uncertainty and (2) where the amount stipulated is either a reasonable estimate of the damages which would probably be caused by a breach or is reasonably proportionate to the damages which have actually been caused by the breach.

*Hall v. Go To Team, Inc.*, No. 15 C 295, 2016 WL 9440867, at *4 (M.D.N.C. Mar. 31, 2016) (citing *Knutton v. Cofield*, 160 S.E.2d 29, 34 (N.C. 1968)). In determining whether a fixed sum of liquidated damages is reasonable or an unenforceable penalty, courts consider "the nature of the [c]ontract, the intention of the parties, [and] the sophistication of the parties. . . ." *Majestic Cinema*, 662 S.E.2d at 23 (citation omitted).

The overarching issue of enforceability is a question of law for the Court. *Seven Seventeen HB Charlotte Corp. v. Shrine Bowl of the Carolinas, Inc.*, 641 S.E.2d 711, 714 (N.C. App. Ct. 2007). However, "[w]hether a liquidated damages amount is a reasonable estimate of the damages that would likely result from a default is a question of fact." *Green Park Inn, Inc. v. Moore*, 562 S.E.2d 53, 59 (N.C. App. Ct. 2002); *see also Ledbetter Bros. v. N.C. Dep't of Transp.*, 314 S.E.2d 761, 767 (N.C. App. Ct. 1984) ("The result of the application of [the *Knutton*] test will also depend on the factual circumstances of each case."). It is HATCI's burden to establish that the Liquidated Damages Provision is an unenforceable penalty. *See WFC Lynnwood I LLC v. Lee of Raleigh, Inc.*, 817 S.E.2d 437, 441 (N.C. App. Ct. 2018) ("The party

seeking to invalidate a liquidated damages clause[,] bears the burden of proving the provision is invalid.").

The Court begins with the first prong of the *Knutton* test, whether damages would be difficult to ascertain. This must be "determined by a consideration of the status of the parties at the time they enter into the contract, and not at the time of the breach." *Green Park Inn*, 562 S.E.2d at 58. Viewing the facts in the light most favorable to HATCI, the Court concludes that this requirement has been satisfied. It is undisputed that Soelect was at the startup stage when the MTA was executed, that the Lithium-X technology had significant value, and that the costs of allowing the technology to be reverse-engineered and used by a competitor would be difficult to estimate. Indeed, HATCI appears to concede this point in its opposition brief. (*See generally* R. 121 at 18–19.)

The second prong of the *Knutton* test presents a more difficult question: whether $10 million is either a reasonable estimate of the damages which would probably be sustained by a breach of the MTA or is reasonably proportionate to the actual damages incurred. HATCI focuses its arguments on the first of these disjuncts, arguing that $10 million is not a reasonable estimate of the damages that would be caused by a breach of the MTA. Soelect, for its part, concedes that it does not have a reliable picture of the actual damages it has suffered due to HATCI's alleged breach. (R. 109-1 at 17.) This concession does not mean that the Liquidated Damages Provision is automatically unenforceable, however, since a liquidated damages clause may be enforced "even though no actual damages are suffered." *E. Carolina Internal*

*Med., P.A. v. Faidas*, 564 S.E.2d 53, 56 (N.C. App. Ct. 2002), *aff'd*, 572 S.E.2d 780 (N.C. 2002).

The relevant inquiry is therefore whether the $10 million stipulated sum is a reasonable estimate of the amount of loss that would probably be sustained in the event of a breach. This question is assessed relative to the parties' positions at the time of contracting. *E. Carolina Internal Med.*, 564 S.E.2d at 56. "No precise mathematical formula exists for determining what is 'reasonably proportionate.'" *Ledbetter*, 314 S.E.2d at 768. For a penalty to be found, "the disproportion must be such as to shock the judicial conscience." *Id.*

The parties dispute Soelect's valuation prior to executing the MTA. Dr. Cho testified that $10 million was a reasonable valuation for the company based on valuations of comparable startups. (*See* R. 109-1 at 178:6–179:19, 188:6–189:10; R. 125-4 at 86:15–87:16.) HATCI argues in response that Soelect's true worth was only $3 million at the time of contracting, an amount which it contends included a control premium. (Def.'s Resp. to Pl.'s SOF ¶ 3.) Soelect contends that the Lithium-X technology was the primary driver behind the company's value as a going concern, (Pl.'s Resp. to Def.'s SOAF ¶ 13), whereas HATCI appeals to the fact that Lithium-X was only one of four products that Soelect had in development at the time of contracting. (Def.'s SOF ¶ 4.)

The parties also dispute the standalone valuation of Lithium-X. (Pl's Resp. to Def.'s SOF ¶ 40.) Soelect's expert, Daniel Van Vleet, opined that the "corrected Fair Market Value of the [Lithium-X] Technology [in 2019] was not less than $11.936

million." (R. 139-5 ¶ 88.) By contrast, HATCI's expert, John Agogliati, opined that the fair market value of Lithium-X in 2019 was less than $5 million. (R. 122-14 at 137:1–137:22.)

Finally, the parties appeal to the surrounding circumstances to bolster their enforceability arguments. Soelect points out that both of the parties to the MTA were sophisticated, that HATCI was in the best position to value Lithium-X due to its previous experience investing in startups, and that the Liquidated Damages provision survived multiple drafts of the MTA. (R. 109-1 at 15–16.) In response, HATCI cites Soelect's 30(b)(6) deponent's testimony that the Liquidated Damages Provision was designed to "protect" Soelect, and was "compensation for bad behavior," as evidence that the clause was intended as a penalty rather than a reasonable estimate of harm. (R. 125-4 at 87:22–25, 120:2–7.)

Although HATCI has met its initial burden of production, factual disputes regarding whether $ 10 million is a reasonable *ex ante* estimate of the damages that would occur in the event of breach preclude granting summary judgment in either party's favor. *See Green Park Inn*, 562 S.E.2d at 59. A reasonable jury could conclude that $10 million represented a reasonable estimation of the harm posed by reverse-engineering a potentially revolutionary technology. However, a jury might also conclude, based on the valuation of Soelect and Lithium-X at the time of contracting and the statements of Soelect's corporate representative, that the amount bore no

relationship to the expected cost of breach. Accordingly, both parties' motions for summary judgment on this issue are denied.

## CONCLUSION

For the reasons stated in this Memorandum Opinion and Order, plaintiff Soelect, Inc.'s motion to strike [149] is granted in part and denied in part, Soelect's motion for summary judgment [106] is granted in part and denied in part, and defendant Hyundai American Technical Center, Inc.'s motion for summary judgment [119] is denied in its entirety. The parties shall submit a joint status report that addresses the anticipated length of trial and whether the parties are available for trial starting on the following dates: October 21, 2024; October 28, 2024; November 4, 2024; November 12, 2024; or November 18, 2024.

Date: June 10, 2024

_____

JEREMY C. DANIEL
United States District Judge